The next case on our calendar is United States v. Andrew Orokinto. Thank you.  Thank you. Good morning. You may take the podium. Good morning, Your Honor. May it please the Court, Tracey Hayes on behalf of the Appellant Defendant, Andrew Orokinto. In this matter, there certainly were no surprises. There was a warehouse robbery, or burglary, better put. That was, you could determine that from the start of the case, pre-trial, during the evidence throughout the case, and certainly the closing of the case. You wouldn't be here if the state of Connecticut decided to bring a charge, a state charge, of robbery or burglary against Mr. Orokinto. Is that correct? That's correct. Yes. But that's not what happened here. What this case is charged with is 18 U.S.C. 659, theft from interstate shipment, as opposed to what Your Honor indicated, which is... I guess the question is, 659 has a provision that says that a judgment of conviction, under the laws of Connecticut in this case, shall be a bar to any federal prosecution. So you wouldn't be here if the Connecticut state officials had decided to, and successfully prosecuted, your client. That's correct. Under U.S.C. section 659, the theft from interstate shipment, that is different than what we see in what's considered a Hobbs Act, or a larceny matter, just general robbery. Here, the Congress circumscribed what it considered theft from shipment. When I indicate there are no surprises, there were no surprises again, there were indeed a burglary at a warehouse. The client had stolen the cigarette cartons from the trucks, that were on the trucks. Would you have an argument available to you under 659? And if not, why not? No, Your Honor, I would not. Why not? Because of what was considered by this court in Estolos, the lodestone issue here at Estolos, where there were bills of lading for those items that were already in the truck. They were certainly loaded on the truck. If there had not been bills of lading, but they were on the truck, ready to go to Massachusetts, for example, would you have an argument? Possibly. There are other factors that we would have to consider, but possibly. In Estolos, there were several factors, and it's progeny. There were several factors. Just loading the trunk is just one of those certain factors. There has to be a waybill, because that is indicated specifically in the statute. There has to be a segment or separation of the items from the stands. There has to be some type of shipping mechanism that happens. So you separate, you load the truck, you create a bill of lading, and you indeed— But you're saying there has to be a waybill for this statute to apply? It is indicated in the statute, Your Honor. It's simply saying that a waybill is going to be prima facie evidence about where the shipment came from and where it was going. It doesn't say you have to have one or the statute doesn't apply. Is that the position you're taking, that absent a waybill, there can be no violation of the statute? Your Honor, I don't want to take such a hard position, but I do want to indicate that in ASTOLAS, which is what— ASTOLAS tracks perfectly the statute. So it indicates all of the factors, whether it's the waybill, whether it's the items were separated, whether they were loaded on the truck. I describe those as indicia of interstate shipment. Absolutely. Not as foolproof, the necessary requirements. That's correct, Your Honor. That's why you answered my question in the way that you did, which is if the cartons had been stolen from trucks ready to go to Massachusetts, and that was the proof, without a bill of lading or any other bill, it's a close call, you said. It would not be dispositive. That was—if we're looking at 659 or if it's charging the state, I believe was what Your Honor— No, no, no. I was talking about 659. I thought you answered my question, my hypothetical. If Mr. Orenquinto had burglarized the cartons on the truck as they were ready to go, they just hadn't had the shipping labels on them, you said that that would be a close call, not the end of the story for us. What I believe is we need to know where those items are headed. Also, with cigarettes, they needed their tax stamp. Absolutely. That is different than in Astolos. Absolutely. It's an extra requirement for interstate shipping is that the tax stamp had to be put on for either Connecticut or Massachusetts. Isn't that correct? That's correct. It's different than Astolos, but it's just one more part of showing how those items, those cartons would have been part of a shipment, interstate shipment. That's what we don't have with the items that were stolen. In terms of what was found on the truck, those were stamped already. Those really— Just to help us out, assume that we disagree with you that bills of lading and specific shipping documents are necessary to support a conviction under 659. Then how do you prevail? Give me a way to where you want us to be. In this case, 8,000 cartons were stolen. Roughly, if we follow what the warehouse indicated, 88% of those cartons would have stayed or remained in Connecticut. 12% of those cartons would have been shipped to Massachusetts. None of those cartons, none of the 8,000, were stamped. We don't know where they would have headed. We don't know they weren't separated or into individual shipments. No pickers were involved. There was no waybill or no invoice to indicate where they were headed. No one disputes that cigarettes are not made in Connecticut, right? They came from somewhere else. That's correct. Nobody was going to smoke them at the warehouse, right? Certainly not. Nobody was going to sell them out of the back.  They were on their way someplace. They weren't, Your Honor. All of them. No? No, sir. They were going to keep them there? What we don't know, the cigarettes that were already loaded on the truck, they were on their way someplace. The cigarettes that were, in fact, still in the containers were not separated, were not taxed. But you think that they were going to stay in the warehouse? We don't know what would have happened to them, Your Honor. Your argument is that they were going to stay in Connecticut. So 88% might have stayed in these food whatever stores or been shipped to Connecticut stores. 12% would be shipped to Massachusetts or New York. That's your argument, right? That's our argument. What we're saying is that here the district court, as well as the government, indicated that there are future shipments. We could just . . . But the evidence, Mr. Hayes, as I understand it, maybe this is the better argument, the evidence was that all you needed was 25 cartons to get to the $1,000 number. And that's just a threshold minimum that triggers a higher statutory maximum. But for criminal liability, all you needed was to show one carton under 659, it seems to me, separate and apart from $1,000. But let's just stick with the $1,000 number. Twenty-five cartons, all that the government needed to show, but correct me if I'm wrong, is that 25 cartons would have gone, would have been shipped out of state to New York or Massachusetts out of the 8,000 cartons. Is that right or wrong? That's what the government argues. No, no, I'm asking you. Is that right? I believe that's wrong because there was no way to show that, Your Honor. Well, they had their own person, their own employee, who testified to precisely that point. Which was incorrect. He could have testified, which he did. What the court considered and what the government argued was, look at the future shipments. Let's look at the past 23 weeks and let's consider those. Let's consider the future shipments. But we don't know what would have happened to those cigarettes, those 25 cartons that were purportedly on their way out of the state to Massachusetts. We don't know what would have happened to them. We don't know. That's a metaphysical we don't know. Not every week we ship these cartons out to Massachusetts and New York. And of the 8,000 cartons, at least 25 of them would have gone to Massachusetts or New York. We can rest assured of that. You're asking for a metaphysical doubt. I'm not. What I'm asking the court is to consider the cartons of cigarettes that were stolen were a product of and owned by the candy company. They were not ready to be shipped out. They were not in any way met any part of the statute. They were not separated. They were not taxed. There was no bill of lading. No steps had been taken. No steps. To segregate them or to transform them, to put them back into interstate commerce. None whatsoever. And what we have to consider is perhaps it was the food bag company that's where these items are sent to. Perhaps food bag would not have placed an order for 25 or 12 of the 25. So we have a concern there. Perhaps anything could have happened at the warehouse. Look what happened. There could have been a fire. Could have been a flood. Anything could have happened. Maybe, I don't know. That's true of cathodes and that's true of sugar. That's true of all sorts of goods that have been in other circuits, certainly deemed to be part of an interstate shipment. Earthquakes, fires, things happen. You're saying that has to be proven beyond a reasonable doubt that it wouldn't happen? No, Your Honor. In those other cases, the cathodes, the minibikes, the sugar cases, the gas cases, those items were already in transit, in interstate transit. Everything that had to be met regarding 659 was already met. There were bills of lading. They were in transport, in a truck. They were already separated. People were buying them. There were invoices. Here, those items were owned by New Britain Canada. Why doesn't this qualify as a temporary stop under 659? Your Honor, in those cases, what's different is this wasn't a temporary stop. These items were owned. So there were invoices from New Britain Candy. They were signed for. They were purchased. They were placed in the shipment area and nothing more. Nothing more. And what we mean by that is, again, there were no bills of lading. None of the other steps had taken place. So unlike those temporary cases where you have items that were already in transit, that's not what happened here. These were still sitting in the warehouse, still owned by the company. Why does it matter that it's owned by the company? Estolos says carriage of property by the owner does not put the property outside of the protection of Section 659. So this was the owner, had the property in a warehouse awaiting shipment to various places in and out of state. But it's one pile of stuff that gets stolen, right? Your Honor, we don't know that. And it was owned here by New Britain Candy. We don't know where these items would have gone. We don't know how they're segmented. We don't know what cigarettes would have been more popular from week to week from any of these food bank companies. Mr. Hastie, you have that in his testimony. Your Honor, things change from week to week. And I don't want to- He's saying that things don't change from week to week for this company. He was. But we don't, what we're doing is looking to the future. And that's what the district court did. It expanded the statute. Here, what makes it different than in other companies in some of the temporary cases, those items were not necessarily owned. They were on their way from one state to another. Here, there was nothing created. Nothing whatsoever. No order. The orders that were placed were for the items that were already on those trucks outside. Those items were headed out of state. They weren't taken. You're asking us for a ruling that requires some shipment order. I'm stabbed. I'm not asking the court to create any new law as what we see here. I'm asking the court to follow its precedent in Estolos, to look at the statute, and to follow that. I'm asking the court to consider that that was not done in this case. There was an expansion of the statute that clearly worked against Mr. Oroquinto. I'm asking the court to look at its precedent and to look at the factors, to look at the other cases that were cited after that, and consider those in making its ruling here. Thank you, counsel. Thank you, Your Honor. We'll reserve two minutes for rebuttal. Thank you. We'll hear from the government. Yes, good morning. May it please the court. I'm Mike Gustafson, U.S. Attorney's Office for the District of Connecticut. I was the trial lawyer in this case. Counsel, why didn't the federal government defer to the state of Connecticut and let them just bring this robbery charge where none of us would be here today? It was an interesting case. Connecticut does not have a grand jury system, and the facts underlying this case, the investigators did, frankly, a very fantastic job investigating the case. Mr. Oroquinto wore a ski mask, a black hooded sweatshirt, and gloves, left no DNA traces, but for analysis of cell phones that was exploited in the investigation with the federal grand jury, the case never would have been solved. So that's... I don't understand. You mean the federal government knew because of cell phones that Mr. Oroquinto did the robbery? You couldn't tell that to the state of Connecticut? I mean, there was nothing barring you from sharing that information with the state of Connecticut? Once we developed the information in the grand jury, I thought the best thing to do was go forward and use the statute section 659, which does cover this activity, Your Honor. Okay, well, that's where we are. Why didn't you charge Interstate Transportation a stolen property, right? I mean, Mr. Oroquinto took the goods past Connecticut. I don't know that... Stolen goods at the time. That's 2314 of Title 18, right? Yes, Your Honor. I don't... I thought about it. I ultimately said not to do it because it's not clear. We know that based on cell phone analysis that Mr. Oroquinto left Connecticut and returned to New Jersey. The next day returned the truck. Our theory is the truck was recovered back in Connecticut. We could not show, as a matter of fact, with the proof that we had, that the cigarettes ever left Connecticut. It's theoretically possible that the truck stopped in Stanford where it was found the next day and was offloaded there. And set aside again for a second, so criminal liability, as I understand it, under 659, is pegged just to stealing a shipment as it's going interstate, right? Yes. And so the $1,000 amount really relates to the maximum, the statutory maximum penalty, right? Yes. If, setting aside the $1,000 amount, Mr. Oroquinto had stolen, instead of 8,000 cartons, had stolen substantially less than that, so 100 cartons. I think where you're telling us to go is to embrace both evidence of regular practice and probabilistic analysis as under 659 to affirm this conviction, right? So if it had been 100 cartons as opposed to 8,000 cartons, would that be enough? Under the statute, yes, Your Honor. Whether we would have exercised our discretion to bring that case is another issue. And 10 cartons might be enough, too, because that's 1.2. Is that correct? That's correct. In this case, the 8,000 cartons was substantially the entire warehouse, practically 75% of the goods in the warehouse, the cigarettes in the warehouse. There were other goods there as well. To deal with the unfavorable facts in this case, that the cigarettes were on a shelf, they had not been stabbed to move out of the warehouse, and they were there waiting for the first step that would transform them back into interstate commerce. Well, I don't know, Your Honor, if things move in and out of interstate commerce. My understanding is . . . Once they landed in the warehouse, they were there, right? True. And they stayed there for a while. We don't know how long, but for a while. We know from Mr. Hastie's testimony that it was the business practice of New Britain Candy to hold the cigarettes in inventory for no more than 10 days. But in any event, that's when they were stolen, during that period, when they were in inventory. Yes, but boxes had been cut open, and they'd been placed on conveyor belts upstairs in the warehouse, next to a safe that had the tax stamps. These stamps are, frankly, very valuable, so they keep them in a safe. And these cigarettes weren't going anywhere without the tax stamps. That's correct. Which leads to the point that they had not reached their final destination, because they had not yet been stamped with either Connecticut or an out-of-state, in this case, stamp. But doesn't 659 anticipate that there have to be some steps taken to put these cigarettes back into interstate commerce? Well, it depends on the cases you're looking at, and I think it's a case-by-case basis in the goods and the timing of when the case was decided. For instance, gasoline's in a pipeline, and it's coming, I think, that's the Williams case, from Texas to North Carolina. And it's taken out of the pipeline and placed in a tank, and then placed on a truck, or into a tanker truck. Astolos was a different set of facts. Astolos is the direct opposite of this. They had the weigh bills. Sure. They had been segregated for shipping. They were in locked trucks. They were ready to go. No doubt those goods were further in interstate shipment. The question is, were these enough? Yes. Were these far enough enough? I would say yes, Your Honor, because if you look at the Maddox case, that was sugar. Come from Puerto Rico in a warehouse in Baltimore. There was no customer orders placed yet, and there was no, the sugar had not been set aside. It was just being stored there. The cigarettes had not been set aside. They were being stored there, like the sugar in Maddox, or the gasoline in Williams, or the copper cathodes, and I think it was Garber. That was, took 28 days they were sitting there, and there was no- Those are out of circuit cases. True. And in Astolos, we, one of the indicia of interstate shipment, commerce, however you want to put it- I use both words in closing argument. The certainty with which interstate shipment is contemplated is evidenced by shipping documents. So the certainty with which interstate shipment is contemplated, I'm very focused on this probabilistic analysis that I think you're asking us to embrace. Yes. In the context of 659. Yes. We have never said anything, we've never embraced quite that theory in the context of this statute. Is that correct? Correct. Never that precise. I think it's there. The statute is designed to promote the flow of goods in interstate shipment, interstate shipment and interstate commerce. The certainty in this case was, Mr. Hasty said the cigarettes were going to go. 12% of them would have been taken to Massachusetts on Monday and Wednesday of that week. Well, 12% would have gone out of state. Monday and Wednesday to Mass, Thursday and Friday to New York and New Jersey. Also the invoices that came in that week that had to be filled. We had the invoices for the shipments to New York and New Jersey that were introduced into evidence as well. So they were going to go. It was just Mr. Oriquinto interrupted the temporary pause along the interstate shipment. So I'm sorry, these were invoices from the end buyer? I'm sorry, what's that? What are the invoices you're referring to? From the food bag convenience stores in Chickapee, Massachusetts, and I forget the cities in New York, but New York and New Jersey and Massachusetts. What is the distinguishing feature of Astolos compared to the cigarettes? Since the cigarettes needed, I keep coming back to, transformation in order to be able to be moved. They needed to be packed and tax stamped. That's a very big step in the selling of cigarettes, isn't it? Absolutely. It's highly regulated by the state, so they're going to be tax stamped. It's important. They couldn't sell them at all. They couldn't ship them without the tax stamps. They could not sell them legally. I think what happens when they get stolen without the tax stamps, they get sold. But I assume that this company, New Britain Candy Company, wouldn't sell them without the tax stamps. Oh, no. And they wouldn't sell to, I think Judge Sullivan asked a moment ago, no one could come up to the New Britain Candy and buy a carton of cigarettes. They were going. Correct. They were going to be shipped to the food bag convenience stores. Which is the government's contention is that's why they were still in interstate shipment, albeit a temporary pause at a warehouse. And then there was. Okay, and that's where we may disagree. Fair enough. So your point is that it began out of state where the cigarettes were manufactured and it ended whatever the food bag store where they were going to be sold retail is. Correct. That's your point? Correct. And so this warehouse was just a stop in the middle where they'd be sort of put in different piles. Correct. And the government took a conservative approach here because I think ultimately, even the cigarettes that were bound for food bag warehouses in Connecticut had not yet reached that location. We did not argue that those cigarettes were interstate shipment. I focused on the notion that 12 percent were going to Massachusetts and New York and New Jersey. But what are you saying now? I'm saying the same thing. I'm saying the government was conservative in its analysis saying ultimately the shipment would have ended when the cigarettes got to their retail location. Okay, but if it began at the manufacturer and ended at the retailer, then it would seem to me what you're saying the statute says is that this was an interstate shipment.  I am saying that, Your Honor. And I think Mr. Arquinto argues that when the cigarettes got to the warehouse, it was the end of the first journey and hadn't started the second journey. I think that's the argument, but I don't have to speak for Mr. Hayes. No, and I think the jury rejected that and Judge Meyer rejected that. I think that is his argument. Was there an instruction on this notion of a temporary stop? Yes, Your Honor. We quote in our brief Judge Meyer's jury instruction. He talked about it could be a pause in the shipment. And just to belabor this probabilistic analysis, if instead of 12 percent the percentage was .5 percent, at some point it's got to end, right? Sure, correct. What point is that? I don't know, Your Honor. I don't have an answer there. I understand the concept of we're getting closer to a line. But in this case, I still think the facts were sufficient to justify the interstate shipment and the $1,000 threshold. Thank you, Counsel. Thank you, Your Honor. Mr. Hayes, you have two minutes for rebuttal. Tell us why this wasn't a temporary stop. Thank you. It wasn't because of the facts of the case. This was not a warehouse that was temporarily housing these cigarettes. It had made its final stop. There were invoices. They were paid for. They remained at the warehouse until something else happened. And it didn't happen here. Until something else would have triggered, they become part and parcel of the interstate shipment. It did not happen here. In returning briefly to whether this was 1,000 cigarettes, 100, 10 cigarettes, or 0.5%, it has to end somewhere. And that's the slippery slope that's concerning here. Your adversary is telling us that on the slippery slope, he's above the cliff, not falling. Your Honor, where would he be falling? I believe that . . . And I guess what he's saying is we don't have to answer that question in this case. I think that this case should . . . I think that should be considered here. Because if we allow this to be a part of now how we look at these cases, what we're doing is not only expanding the statute, we're making this look like, again, some type of federal larceny or some type of Hobbs Act. There's a statute for that. But aren't you asking us to do exactly what the circuit in Astola said not to do? The language there, and it repeats other cases here and elsewhere, is that the court has repeatedly held, given the all-inclusive sweep of its terminology, that Section 659 is designed by Congress to promote the flow of goods in interstate commerce. And carrying out this purpose is not to be hampered by technical legal conceptions. It seems to me that you're asking us to engage in this sort of line-drawing game in a warehouse. If they had stamps, if they were in this pile, if they were in a big pile, and one of those lines means the statute applies and one means it doesn't. And that seems to be exactly the kind of technical legal conceptual process that they've told us not to do. Your Honor, I don't believe so. The other cases that are cited, even after Astola's, one was cited, the Maddox case with the sugar. There, the sugar was transported from Puerto Rico, ends up here in the States. It's a fungible item, so it needs to be moved off the shelf, similar to what we have here with the cigarettes. In that case, contracts are drawn weeks in advance. That's not what's done here. So when I asked the court to consider the steps were not taken, there were no contracts. If these 23 weeks of- Does the statute require contracts? Am I missing something? No, no. The statute requires, to consider the bills of lading, the way bills, something to show. Here, nothing happened. If we look at what's technical, we go back to the Maddox case. How about testimony? How about testimony? Why isn't that a prima facie evidence? Because you looked in the future. It still didn't track, as the court just heard from the gentleman prosecutor, still did not track the statute, still did not track Astola's. But isn't a way bill also a prediction of the future? We plan to be in Massachusetts in two days? Sure. And why, if we look at the analysis from the 23 weeks preceding, why wasn't that done? If these food-backed companies routinely buy these items every week, as we saw from the previous 23 weeks, just send the contract. Why not have these in advance so we can avoid what we're seeing here? The invoices. The invoices were for purchases, Your Honor, from Philip Morris and the other cigarette company to say that we purchased these items. We being New Britain Candy purchased the items, now owns the items. The invoices have nothing to do with they're now going on their way to the food-backed corporations. That's a separate contract. And that's a separate bill that needs to be drafted. So that's different than what we see here. And I just briefly get back to that sugar case, because if we look at what's done there, why not we follow that here similarly? Why not we draft those contracts weeks in advance? If we can now argue, or if the government can now argue that 23 weeks before, this is what we saw, so we're guaranteed that'll happen in this case. We can't look in the future with this, because it's not indicated in the statute. And that's not how the statute is constructed. And we're asking the court to consider that. Thank you, counsel. Thank you. You've presented us an interesting problem. The next case on our calendar is-